UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


BARBARA LYNCH                                    CIVIL ACTION NO.

v

FLUOR FEDERAL PETROLEUM
         OPERATIONS, LLC,
Sclafani SCLAFANI, and                           JUDGE:
Ms Davenport DAVENPORT                                    Magistrate Judge:

### COMPLAINT FOR SEXUAL, AGE,  and RETALIATORY HARASSMENT; RACIAL DISCRIMINATION; WRONGFUL TERMINATION, AND TWO COUNTS OF BATTERY
### (Jury trial demanded)

### Jurisdiction and Venue

1.     Jurisdiction for all counts except the battery counts is based on 28 USC sec 1343.  Jurisdiction for the battery counts is laid under pendent-claim jurisdiction.  Venue in this district is proper because all conduct complained of occurred in this district.

### Parties

2.     Plaintiff is Barbara Lynch.  She is a 49 y.o African-American female.

3.     She was employed by the federal claim defendant,  Fluor Federal Petroleum Operations (FFPO), LLC, as a Procurement Contract Technician for the six-person LE 2 Group at the rate of $55,000/yr with benefits.

4.     FFPO's New Orleans office is the central office for the management of  the Strategic Petroleum Reserve (SPR) under contract with the US Department of Energy.  FFPO employs over 500 .

5.     She was terminated July 31, 2019 for violation of FFPO's Workplace Violence Prevention Procedure and Code of Business Conduct and Ethics.

6.     Defendant under the first battery count is Scott  Sclafani. Mr Sclafani is currently employed by FFPO as a buyer on the LE2 side of Procurement in its New Orleans office.

7.     At all relevant times he was employed in the same group, LE2, as plaintiff was employed.

8.     Defendant under the second battery count is Ms Stacie Davenport.  Ms Davenport was formerly employed by FFPO as a buyer also in the LE2 group.

### Relevant supervisors and managers

9.     The top ranked relevant manager was Brian Roberts, Senior Director of Procurement and Subcontracts.  Ruth Hollingsworth was Procurement Manager.  Angela Keller was the Procurement Systems Program Manager. Plaintiff's supervisor at all relevant times was Jorge Perez, Director of Procurement and (Sub)Contracts.  Ms Susan Sharlow was a Sr Subcontract Administrator, now transferred.

10.    Ms Keller was in charge of the SAP computer system which tracked defendant's procurements.

11.    Ms Keller directed all of plaintiff's SAP work.

12.    Ms Ginger Roques was an HR manager.

### FFPO structure

13.    FFPO (New Orleans) was divided into two sections - Maintenance & Operations (M&O) and Life Extension 2 (LE2). The M&O side had about 15 members.

14.    The LE2 had six employees - Perez, Sclafani, Ms Davenport, Meredith Landraneau, Leslie Morris (all white), and plaintiff.

15.   Plaintiff was the only unambiguous African-American in the two Procurement sections.

16.   Sclafani, Ms Davenport, Ms Landraneau, and Ms Morris were buyers.

17.   Rebecca Marsh was a white female hired two weeks before plaintiff, with the same job title in M&O (Maintenance and Operations) as plaintiff.

## Nature of  FFPO work

18.   The work of FFPO was divided into SAP and non-SAP work.

### *SAP work*

19.   Both sections made procurements via the SAP computer system for the SPR operations of FFPO, that is, FFPO would receive Purchase Requisitions (PR's) from the field; they were entered into the SAP computer system; assigned to a buyer on the LE2 side theoretically by Perez on the LE2 side and by Ms Keller or Ms Hollingsworth on the M&O side; the buyer would send out a bid notice and a vendor chosen based on the bids; the buyer's completed list of items with the wining vendor was automatically routed to various departments for approval; the PR became a PO; the purchased item was received at the required location and logged in for payment to the vendor; payment would be made and the PR closed out; finally, the closed out PR's would be boxed up periodically and sent to archives.

20.   Plaintiff expected to participate in monitoring this SAP procurement process for delays from start to finish and to perform most of the SAP and non-SAP functions.

21.   There were at least four reports - some weekly, some monthly - for which SAP access was required and the preparation of which was in plaintiff's job description.

22.   Her expectations were based on the job description, interview with Perez and Hollingsworth, and general conversations soon after hire with Perez.

*Non- SAP work*

23.  Non-SAP work consisted of, for example, updating weekly power point presentations; scheduling meetings; preparing meeting minutes and agendas for the weekly LE2 group status meeting; drafting transmittal letters; re-working the organizational chart.

24.  There were three-four team functions.

25.  There was at least one report preparation of which did not require SAP access.

## Count 1- Sexual harassment

26.  Made defendant under this count is FFPO.

27.  Routinely, around her fifth week at work, Sclafani began to appear in her work area unnecessarily about 1-2 times/week.  He would sit in her cubicle for 10-15 minutes and attempt to engage in general, non-work related conversation.  On other occasions he would stand in her office uncomfortably close, sometimes touching her shoulder.  She asked him to leave and he did so, but with a negative facial expression and a hostile laugh.  This happened at least twice.

28.  However, he then began to pass by her cubicle at least 2-3 times per week and place himself in proximity to her at other office locations also at least 2-3 times per week.  On some days this occurred as many as four times. Sometimes he would make a guttural sound as he passed.  This continued until nearly her last day at work.

29.  On February 21, 2019, Sclafani trapped plaintiff in a co-worker's cubicle and massaged her shoulder.  This message was proceeded by a forcible grab which trapped plaintiff in the cubicle as she tried to leave. He released her shoulder and then grabbed it again and massaged it.  The massage was also forcible as he dug into her shoulder.

30.  As plaintiff again tried to leave, he stood in the cubicle doorway which he blocked by extending his arms across it.

31.     Plaintiff left by ducking under Sclafani's arms.

32.     The above course of events constitutes sexual harassment by a co-worker.

33.     FFPO had notice of Sclafani's having previously sexually harassed two co-workers.

34.     The first co-worker reported Sclafani.

35.     However, afterwards he harassed a second employee.

## Count 2- Batteries by Sclafani

36.     All of the above touchings before February 21 constitute batteries by Sclafani.

37.     The incident on February 21, 2019 constitutes two separate batteries.

## Count 3- Race discrimination

### Basis of Count 3

38.     This count is based on the racial animus of Ms Keller which operated to exclude plaintiff from all SAP functions; from almost all SAP viewing; and from most non-SAP work such that plaintiff was reduced to cleaning up the file room and busy work studying manuals in her cubicle.  This exclusion materially reduced plaintiff's chances for equal success in her job and for promotion.

### Keller's Different Treatment of Plaintiff

39.     Within a week of coming on the job  plaintiff noticed a difference in the way Ms Keller  treated her as compared to the way she treated Ms Marsh.  Ms Keller was more cooperative with Ms Marsh than with plaintiff.

40.     For example, after checking in the supply room plaintiff asked Ms Keller for a supply item.  Ms Keller, in an exaggerated manner, directed plaintiff to the supply room.

41.  When plaintiff replied that she had already checked there, Ms Keller merely suggested she look around.

42.  By comparison, on an occasion when Ms Marsh asked for an office supply item, Ms Keller would find it for her or give her one of her own.

43.  Plaintiff was assigned the worst of the vacant cubicles.  Hers was by the copier where there was a lot of traffic.

44.  After a week or so, she asked Mr Perez for a better cubicle, but he told her that Ms Keller said "No."  Plaintiff then "appealed" to Ms Hollingsworth who also denied the change.  Plaintiff made no further requests.

45.  However, she thereafter saw all new white employees assigned better cubicles by Ms Keller or Ms Hollingsworth.

### Keller's Exclusion of Plaintiff from SAP Work

46.  Beginning in the first or second week, plaintiff, until the very end of her employment, was actively excluded by Ms Keller from all meaningful work.

47.  She heard Ms Keller say at least twice, "Barbara can't do it."

48.  The first remark was made after plaintiff's first or second week on the job and barred her from some type of SAP work.

49.  The last such remark was made in late April/early May (before May 7, the date of a team building workshop) in connection with planning for the workshop: "We'll just give it to Rebecca [Marsh]; Barbara can't do that."

50.  LE2 moved to a new building on May 10, 2019.

51.  Within her first month on the job, plaintiff began to notice that LE2 SAP work was being given primarily to Ms Marsh, but also to Neil Fisher (white), Krystal Umana (white, former employee), Lisa Prados (white), Linda Le (Asian), Ms Meredith Landraneau (white), and Ms Davenport.

52.  When FFPO made occasional SAP assignments to plaintiff they were revoked by Ms Keller.

53.     In mid-November, Ms Sharlow assigned plaintiff to do close outs on SAP. On the same day Perez authorized her to do more closeouts.

54.     About a week later at a Procurement staff meeting, Ms Hollingsworth, seated next to Ms Keller, remarked to plaintiff, " I heard you're doing close outs" and added, "That's good", giving plaintiff the "thumbs up" sign.

55.     Plaintiff thanked her and Ms Keller remarked, "Doing closeouts?"; wrote something on her tablet; looked at plaintiff and uttered, "Huh!?"

56.     Within an hour, plaintiff discovered she was blocked from the SAP closeout function.  She asked Ms Sharlow, then Perez what had happened.  He replied, "Angie has blocked you."

57.     Plaintiff asked why and he replied, "That's just the way it is. It's up to Angie. She's in charge of SAP."

58.     This was the first of about four times Perez told plaintiff some version of this.

59.     A few days later, plaintiff overheard Ms Marsh describing her work on SAP closeouts.

60.     On December 4, 2018 Perez tasked plaintiff with assigning PR's to buyers. She reminded him that Ms Keller had barred her from doing this, but Perez replied that he was out of town and did "not have time for this today.  I'll deal with Angie later."  He asked, "Who's the closest?"  Plaintiff replied it was "Meredith [Landraneau]."

61.     Ms Landraneau showed plaintiff how to assign PR's to buyers.  Ms Landraneau made the first two assignments.  When she had to leave, plaintiff made the third.  All were made from plaintiff's computer because Ms Landraneau's was not working.

62.     Almost instantly, Ms Keller came to plaintiff's cubicle yelling and screaming at her. She state she had gotten an email that assignments had been done by plaintiff.  She stated, "She had not given plaintiff access or authorization to assign PR's.  I told you I did not want you doing that."

63.   Plaintiff asked Ms Keller to let her explain that Ms Landraneau had used plaintiff's computer because hers was not working.  However, Ms Keller cut her off.

64.   She yelled at plaintiff "not to make any changes in SAP.  Do you understand that?"

65.   Plaintiff replied, "OK."

### Keller's use of racial slur

66.   On December 6, 2018, Ms Keller called plaintiff into her office.  She did not like leaving things open ended and wanted to apologize for her conduct "the other day" when she had yelled at plaintiff and accused her of performing work she had not authorized.

67.   Plaintiff replied "OK."  She added that she was not there to be treated that way and be abused.

68.   Ms Keller added a few remarks about teamwork to which plaintiff again replied "OK" and got up to leave, saying she would see Ms Keller later.

69.   Plaintiff took three or so steps, got to the door and heard Ms Keller say, in a measured and deliberate way, "Nigger."

### *Sclafani's use of racial slur*

70.   On July 22, as Sclafani encountered plaintiff in the bathroom hall and opened the men's room door, he stated under his breath, "Black bitch!"

### Keller's Continued Exclusion of Plaintiff from SAP Work and Training

71.   On December 12, Robert met with plaintiff and tasked her with a monthly SAP report.  However, plaintiff was not able to make the first report because Ms Keller at an informal staff meeting that included plaintiff, Perez, and Robert stated that she could not have SAP access to prepare the report.

72. In January 2019 Perez and Ms Keller went "head-to-head" in front of the LE2 Group over whether plaintiff or Ms Marsh would be assigned certain SAP work. Perez favored plaintiff; Ms Keller favored Ms Marsh.

73. The next SAP assignment went to Ms Marsh.

74. In early March, Ms Keller advised the entire Procurement group at a staff meeting to disregard the general SAP training.

75. About a week later, plaintiff asked her if she would get training. Ms Keller replied that she was going to redo the SAP procedure manual. Plaintiff asked if she would get training in the manual.

76. Ms Keller replied, "You do not need to know that right now." She emphasized the word "You."

77. About the same time Perez and Ms Keller had another contentious meeting in front of the LE2 Group over whether plaintiff or Ms Marsh would be assigned certain SAP work. Perez and Ms Keller asked the Group to leave.

78. As plaintiff left she could hear through the vent that the two were already arguing in raised voices.

79. Later Neil Fisher remarked, "They're still arguing. Angie is pissed."

80. The meeting lasted about 20 minutes.

81. Ms Keller went into Robert's office. Her face was red.

82. Leslie Morris asked plaintiff, "Did you see how mad Angie was? She was pushing back."

83. After this meeting, plaintiff continued to be unable to make any substantive SAP changes and had only viewing privileges.

84. In late March/early April Perez while in his old office asked plaintiff for a second time to help with assigning a PR.

85. Plaintiff again reminded him of Ms Keller's prohibition.

86.   He replied, "I know, but I need to get it done."

87.   Plaintiff asked, "What's the deal?  Am I going to get training?"

88.   Perez pulled his office door closed and said, "Angie does not want you to do SAP."

89.   In early June in the small new conference room, Perez advised that Ms Le would get training from Ms Keller in entering PR's.  Plaintiff asked if she could sit in on the training.  Perez replied, "You don't need to learn that right now."  Plaintiff observed she and Ms Lee were at the same level on not knowing and asked if it would make sense for her to join in.  He replied, "No."

90.   Plaintiff mentioned someone's ripping her velcro name tag from her cubicle 3-4 hours before the meeting, but did not publically identify who had done it.

91.   Within 2-3 minutes after the end of the conference, plaintiff went to Perez' new office.  She identified "Nadine" [Anthony] as the one who took the tag. He replied that "people are going to get fired for the little things they keep doing. If you keep reporting things to HR you will get fired.  That's just the way they work here.  But you can report it to HR if you want to."  He did not "want me to leave the team because he was the one who hired me."

92.   Plaintiff asked why she could not get training with Linda.  He replied, "Angie said 'No, you can't have the training.'" This was the last time she was told by Ms Keller or Perez that she could not have anything (except very limited viewing privileges) to do with SAP.

**Plaintiff Necessarily Barred from Preparing SAP Reports**

93.   There were at least five reports - some weekly, some monthly - the preparation of which was in plaintiff's job description.  However, she was tasked with only one - a non-SAP weekly status report of work packages.  As a result of Keller's barring her from SAP work, she was necessarily barred from preparing the other (SAP) reports.

**Plaintiff's SAP "Work" Limited to Some Viewing Privileges**

94.   Plaintiff ultimately had only very limited viewing privileges related to SAP. She could determine if PR's had gone through the chain of approval. She was not authorized to make corrections, but only to point out the problem to Robert and Perez.

95.   She was allowed to view buyers' comments; the status of the approval process; and when the PR turned into a PO.

96.   She was barred from even viewing the LE2 distribution site on the Sharepoint library which was set up by Ms Davenport.  Plaintiff was barred by Ms Davenport.

97.   Had plaintiff been allowed to perform SAP functions, they would have constituted about 60% of her work day.

**Exclusion from non-SAP work**

98.   In late May/early June, Mr Perez began to take non-SAP work (e.g., updating weekly power point presentations; scheduling meetings; preparing meeting minutes and agendas for the weekly LE2 group status meeting; drafting transmittal letters; re-working the organizational chart) away from plaintiff and assign it to Ms Le.

99.   Further, there were three-four team functions plaintiff was to perform with Ms Marsh, plaintiff's M&O counterpart, a white female.  However, Roberts, Ms Hollingsworth, Ms Keller, or Perez always relegated plaintiff to the second seat such that she participated in less than half the discussions (of which she knew) between one of the managers and Ms Marsh and remembers only one discussion between a manager and herself.

100.   One of these functions was preparation for the team workshop.

101.   There was another, the identity of which plaintiff cannot remember, as to which she messaged  Ms Marsh that, if she were not going to be included in the collaboration,  to be included in the transmittal of the finished project.

102.   Full participation in the non-SAP work would have added another 15% to her work day.  That is, combined with the SAP work, these tasks constituted about 75% of her work day.

103.   Failure to assign SAP and non-SAP  tasks and to train plaintiff in SAP materially disadvantaged her equal chances to perform well and gain promotion.

## Count 4 -Retaliatory and age harassment

### *Retaliatory harassment*

104.   On Friday morning, February 22, 2019 at about 8:45 plaintiff reported Sclfani's conduct of the day before to Perez.

105.   She gave him the history of Sclafani's unwanted touchings beginning with his standing unnecessarily close to her chair in her cubicle and consequently uncomfortably close to her back and right side, sometimes touching.

106.   She told him it had happened several times.

107.   She also told him that Sclafani had moved on to leaning around her from a standing position on her left with his right arm around her and his body touching her left shoulder.

108.   She stated she reacted by moving away and looking at him with disapproval.

109.   Plaintiff told him this also happened several times.

110.   Perez advised that different cultures are accepting of touching in different ways.  He used the example of Hispanic culture which is passionate and to hug and kiss people  when meeting them.

111.   Plaintiff responded that Sclafani's actions were not that.  It was predatory and calculated.

112.   Plaintiff reminded him about Ms Davenport's not being cooperative.

113.   Perez advised he would contact HR and later (9:30-10:00) confirmed he had

done so.

114. At about noon on Friday plaintiff saw Perez and Sclafani reentering the building from the front. (On Monday Ms Roques advised that Perez had talked to Sclafani about the touching.)

115. Retaliatory harassment by Sclafani began almost immediately with unnecessary remarks to plaintiff about PIN # access on Friday afternoon.

116. On Monday, Sclafani discussed the PIN # situation with Ms Davenport and described his attitude toward plaintiff in the PIN # discussion in obscene terms.

117. From this point on, Sclafani, Ms Davenport, and the rest of her work group as well as others in other work groups situated nearby in the same building began to treat plaintiff differently.

118. For example, the work group met regularly with 4-6 others in GFP Tracker meetings.

119. At the meetings both Sclafani and Ms Davenport would make negative facial gestures toward her.

120. On July 10 at the weekly group status meeting Ms Davenport and Sclafani were seated next to each other. Sclafani stated, "Look at her over there." She replied, "She's so stupid." They were both looking at her.

121. These got so bad that on July 23 plaintiff began to sit separately from the meeting.

121, After plaintiff's first complaint, Ms Davenport began to visit employees in the M&O group. These employees then became unfriendly with plaintiff.

122. One, Jeanne DeLaSalle, made a negative remark about plaintiff's reporting Sclafani. She was standing next to plaintiff and dancing while a cake was being presented to a co-employee. She remarked that she had "better quit dancing before you report me for inappropriate contact."

123. Another M&O co-employee, Nadine Anthony, was abusive toward plaintiff

several times. For example, she saw plaintiff knocking for entry, but ignored her.

124. She came to plaintiff's cubicle and yelled at her for printing one page to the printer nearest her (Ms Anthony) when several printers were down and many other employees had printed to that printer.

125. Ms Anthony took plaintiff's name tag off her cubicle in earlyJune.

126. Beginning soon after February 22 and lasting as long as the LE2 group was in the old building (until @ May 10), when co-workers in the Procurement Department saw plaintiff in the hallway they would grab the walls and press themselves against the walls.

127. This practice continued in the new building.  The Procurement Department would be invited to the LE2 group meetings every other week.  When its members saw plaintiff they reacted as they had in the old building.  This practice continued until about her last day of work.

128. On May 23, Anthony Donfronio came around a corner and happened upon plaintiff who was unexpectedly sitting in a chair.  When he saw her, he took off running.

129. On March 14, 2019 Sclafani passed by her cubicle and warned plaintiff, 'You can not hide from me.  You better be scared of me.  You can't run from me."

130. On March 16, 2019, plaintiff delivered a  written complaint to Ms Roques about  the reaction of Sclafani and a co-worker friend, Ms Davenport, to plaintiff's complaint about Sclafani's sexual harassment and possibly other issues.

131. The complaint was accompanied by a letter from plaintiff's doctor relating her treatment to high blood pressure.

132. The complaint requested transfer to a department different from Sclafani or at least a work station away from him.  The same requests were also made as to Ms Davenport.

133. The only known relief for plaintiff is that she was moved to a cubicle further

away from Sclafani and this separation was maintained when the LE 2 Group was moved to a new building. This relocation also moved plaintiff further away from Ms Davenport and that approximate separation was maintained in the new building.

134. On March 26, plaintiff's new chair was missing from her work station and she never found it. She replaced it with her old chair which had stains and was full of beaded lint; the seat was split on the sides.

135. On April 5, in the morning Sclafani passed by plaintiff's cubicle and farted.

136. He did this on the mornings of April 17, May 31, and June 10.

137. Plaintiff was drug tested on April 17, April 25 and June 11.

138. On May 7 in a team building exercise, Ms Sharlow stated that "should volunteer on teams and stop being standoffish" while motioning toward plaintiff.

139. On May 14, 2019 Perez told plaintiff directly: "I think the group is not ready for someone who looks like you and me. I think that's why you are being mistreated." Plaintiff had come to his office to complain that Nadine had singled her out of 12 users of a printer for criticism over that usage.

140. On May 15, plaintiff called in to a team building meeting twice. No one answered the first time so she called in again. This time someone answered and plaintiff heard Ms Davenport utter, "Shh. It's her. She's on the phone. She'll hear you." Sclafani then began to talk, but because plaintiff could not tolerate his remarks about team building, she disconnected. This call in scenario occurred one other time. However, no one answered. The call-in has caller ID.

141. On May 20, plaintiff spoke to Ms Roques about Sclafani and Ms Davenport's continued mistreatment and about how the other members of the team had begun ostracizing her.

142. Ms Roques advised that if anything else happened to let her know.

143. Plaintiff got no recognizable relief.

144. At a May 23 staff meeting for all of Procurement, Susan Sharlow stated that "overtime might be required - it would take staying over instead of sitting in their cubes not cooperating with the rest of the team." She looked at plaintiff. Then Ruth Hollingsworth (Procurement manager) stated "everyone should remain professional at all times" and turned and looked at plaintiff.

145. There was a similar tone to a meeting of May 28.

146. After the May 23 meeting, Nadine came to plaintiff's cubicle entry and just stood and stared. When plaintiff asked her if she could help her with something, she replied, "Just looking." This happened on one other occasion.

147. On May 23, Ms Davenport and Nadine were discussing their conversations with about plaintiff's complaints about them. Ms Davenport said, "Barbara's stupid. She's the one with the problem and the reason the group does not get along."

148. On May 29 Nadine and Ms Davenport made fun of plaintiff. In her presence, Ms Davenport would utter "Badda bing" and Nadine would complete the couplet with "Badda boom" and then laugh. This happened one more time on June 6.

149. Beginning June 3 and continuing for 2-3 weeks plaintiff was tasked with re-organizing the file room. On 3-4 occasions each day Nadine would "inspect" the file room and then remark to Ms Davenport how poor a job plaintiff was doing.

150. On June 4, plaintiff complained to Perez about not being copied on emails from Davenport and Sclafani.

151. On June 6, when plaintiff reported Nadine's removal of the name tag to Perez, he warned that if she continued to report incidents she would be fired. He repeated his statement that the group was not "ready for someone who looked like him and me."

153. On June 12, Ms Davenport summoned Sclafani to the file room. Sclafani remarked. "This is so dumb. Look at all this paper!" Ms Davenport replied, "She's so stupid!"

154. On June 29, Ms Davenport saw plaintiff coming and scoffed while turning her head.

### *Age harassment*

155. On March 21, 2019 plaintiff found a photograph of an old gray-haired lady on her desk.  The day before plaintiff heard Ms Davenport remark, "'Where are you, Emma?'  I can't find Emma. I can't find the picture.  I can't find it.  Oh, well, I'll just print another one." Ms Davenport made the remark to Anthony Donfronio and Rebecca Marsh who laughed and walked around looking for it. Plaintiff saw Ms Davenport print what looked like a photograph of a face on a copier.  She did not pay much attention to Ms Davenport.  Later that day plaintiff saw a photograph of a gray haired lady pinned to the outside of her cubicle.  She ignored it.  Later she saw the same photograph on the floor of her cubicle by the chair closest to her cubicle entrance.  She ignored it and continued to come and go from her cubicle.  By COB it was gone.

154. The next day in the morning after having come and gone from her cubicle a couple times she saw the same photograph on her desk.  She took it to Ms Roques who advised she would contact IT in order to determine if it had been made on the copier plaintiff saw Ms Davenport use.

155. Plaintiff followed up at least twice with Ms Roques.  The first time she replied, "It's under investigation."  The second time, a day or two later, she replied that she could not tell plaintiff the results.

156. Thereafter, Ms Davenport's hostile looks at plaintiff became both more frequent and intense.  Additionally, she again excluded plaintiff from emails to their common work group.

156. After the old lady photograph, plaintiff found an old, soiled bandage on the floor in her cubicle. Plaintiff interpreted this as a suggestion that she was unclean and a threat that she might be injured and need a bandage.  She reported the incident to Ms Roques.  Plaintiff gave the bandage to her attorney and there was no investigation by Ms Roques  as far as she knows.

### **(Another) Failure to remedy**

157. On June 25, 2019 Ms Roques was supposed to contact plaintiff in order to set up a meeting to catch up about plaintiff's situation, but she did not.

158. On July 9, 2019 she mistakenly called plaintiff, but, nevertheless, assured plaintiff she would call plaintiff back in order to have a meeting.

159. She did not.

### Retaliatory harassment, cont'd

160. On July 22, as Sclafani encountered plaintiff in the bathroom hall and opened the men's room door, he stated under his breath, "Black bitch!"

161. At the meetings both Sclafani and Stacie would make negative facial gestures toward her.

162. These got so bad that on July 23 plaintiff began to sit separately from the others at the LE2 staff meetings.

163. On July 30, 2019 (the day of the fight with Ms Davenport) plaintiff returned from an off-site meeting attended by Sclafani and Ms Davenport.

164. They got back to their offices before she did.

165. At this meeting plaintiff had sat away from Sclafani and Ms Davenport.

166. On this meeting, Ms Davenport said aloud to Sclafani, who was sitting right next to her, "Why doesn't she want to sit by us?  Maybe she doesn't want to sit by us?"  Sclafani also said, "Maybe she doesn't want to sit by us."  (This scenario had also occurred at the meeting the week before.)

167. When plaintiff returned to her cubicle, she found her speakers face down on her desk; her Bible, her 6" ceramic turtle, stress ball, etc were out of place.

168. After seeing the disarrangement in her cubicle, plaintiff stepped outside for a "breather."  On the way back in, she encountered Ms Davenport who gave her a negative look.  Plaintiff was in the vicinity of the cubicle of Ms Morris and may have uttered "A-h-h" as her customary signal to Ms Morris that she was under stress.

169. Plaintiff proceeded to turn a corner and heard Ms Davenport yelling, "Don't call me a ho'!"  Plaintiff denied this and kept going toward her cubicle.

However, Ms Davenport chased her into her cubicle.

170.   Plaintiff, again denying having called her anything, instructed her to leave which she did.

171.   However, after a few steps, Ms Davenport came back and said, "Barbara, if you don't like your job, go work at McDonald's!" and walked away.

172.   Plaintiff replied, "You go to McDonald's."

173.   Ms Davenport rushed back to plaintiff's cubicle, pushed her twice on the chin, grabbed her by the neck and hair and threw plaintiff on her left side to the floor where she proceeded to mash her face with the palm of her hand and to scratch at her face with her fingertips (which lacked nails).

174.   Ms Davenport's conduct constitutes retaliatory harassment.  As a result of this conduct, plaintiff suffered injuries to her right foot, neck, back, head and roots of her hair.

175.   She continues to feel pain in some of those areas.

176.   She alleges that the battery was part of the retaliatory harassment by Ms Davenport.

177.   Plaintiff had orally complained of the harassment by Sclafani and Ms Davenport to Ms Roques at least four times and in writing several times.

178.   After each complaint the known harassment by Sclafani and Ms Davenport remained about the same, but the general office mistreatment would get worse.

179.   Plaintiff asked for transfer, but was first told Fluor would look around and see where it might place her and on a second request that she would have to wait and see what became available.

180.   Plaintiff was terminated July 31, 2019 for violation of workplace rules against fighting.

## Count 4 - Battery by Davenport

181. Paragraph no. 173 constitutes battery by Davenport.

## Count 5-Wrongful termination

182. Plaintiff alleges her termination was caused by defendant's failure to take effective remedial action against the retaliatory harassment which culminated in the attack by Ms Davenport making the termination a product of the harassment and therefore wrongful .

## Relief sought

183. Under all federal counts for harassment, plaintiff seeks damages for emotional pain and suffering;

184. Under the federal count for retaliatory harassment, she seeks damages for physical pain and suffering and medical costs;

185. Under the federal count for wrongful termination, plaintiff seeks past lost wages; future lost wages for seven years;

186. Under all federal counts she seeks emotional distress; punitive damages; attorney fees, costs, and trial by jury;

187. Under the battery count against  Sclafani, plaintiff seeks damages for offensive touchings and emotional distress;  costs; and trial by jury.

188. Under the battery count against Ms Davenport she seeks damages for physical and emotional pain and suffering; medical expenses; costs, and trial by jury.

189. Under all counts she seeks all other legal and equitable relief.

Respectfully submitted.
J Courtney Wilson 13561
/s/ J Courtney Wilson
1510 Veterans Blvd
Metairie, La 70005
(T) 504/832-0585
(F) 504/846-2400 (pref'd)

PLEASE DO NOT ISSUE SUMMONS
NOTICE AND WAIVER WILL BE TRIED FOR:

FLUOR FEDERAL PETROLEUM
OPERATION, LLC,

Scott  SCLAFANI,
4245 Indiana Ave.
Kenner, La   70065

and

Ms Stacie DAVENPORT
4927 West Napoleon Ave
Metairie, La 70001